UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

In the matter of:

T & T Investment Properties, LLC,   Case No. 09-77048-MBM
                                     Chapter 7
          Debtor.          /         Hon. Marci B. McIvor

**OPINION SUSTAINING, IN PART, LEO TOSTO'S OBJECTION
TO THE CLAIM OF PAUL ARSLANIAN, AND
REQUESTING ADDITIONAL INFORMATION FROM
CLAIMANT PAUL ARSLANIAN**

I.
FACTUAL BACKGROUND

On September 9, 2002, Thomas Beer and Allen Stalter organized Laker Group LLC. The Laker Group was formed to buy and sell properties for investment purposes. The Laker Group sought to make money for its principals and for parties that invested in the properties purchased by the Laker Group.

In January, 2005, Len Tosto and his father, Leo Tosto, formed T & T Investment Properties, LLC ("T&T"). Len and Leo originally each owned fifty percent interest in T&T. The purpose of T&T was to lend money to others for the purpose of buying and rehabilitating properties and then selling the properties for a profit. (Tosto dep., Defendant's Exhibit 6A at 58-59, 61-62.)[1]

In October 2005, Thomas Beer and Allen Stalter formed One Nation Financial ("One Nation") in which they each held a fifty (50%) percent interest. One Nation was a

---

[1] The references to exhibits refer to exhibits attached to Paul Arslanian's Motion for Summary Judgment (Docket No. 42) and Len Tosto's Response to Plaintiff's Motion (Docket No. 54) in Adversary Proceeding No. 10-4902).

mortgage broker. (Stalter dep., Defendant's Exhibit 6B at 38). One Nation existed, in part, to finance mortgages for purchasers of properties owned by the Laker Group.

Between 2005 and 2007, T&T worked with the Laker Group and One Nation. T&T provided money to the Laker Group for the purchase of properties. T&T provided money to One Nation to fund mortgage loans. These transactions were profitable for both Tosto and T&T. (Tosto Affidavit, Defendant's Exhibit 5; Tosto dep., Defendant's Exhibit A at 50, 51.)

In 2007, creditor Paul Arslanian sought the services of Len Tosto, in his capacity as a commercial real estate broker, to locate an office building for Arslanian's law firm. Although Tosto did not locate a building, Arslanian and Tosto discussed possible investment opportunities. Tosto told Arslanian about T&T, the real estate investment business which Tosto owned with his father, Leo Tosto. Tosto also explained in a broad sense how T&T made money through investing in real estate deals. (Arslanian dep., Defendant's Exhibit 6E at 64-67.)

Commencing in the summer of 2007, Arslanian participated in two investments with T&T, hereinafter referred to as "Investment I" and "Investment II." Arslanian also invested in one additional real estate deal with Len Tosto (hereinafter referred to as "Investment III"), but there is nothing in the record to indicate that T&T funds were involved in this real estate transaction. A full explanation of Arslanian's investment deals with Len Tosto is set forth in this Court's "Opinion Denying Plaintiff's Motion for Summary Judgment" in Adversary Proceeding No. 10-4902 (Docket No. 82, at 9-10). However, the Court will summarize Arslanian's investments with Len Tosto and T&T (Investment I and Investment II) for the purpose of analyzing Arslanian's claim against

2

T&T. Arslanian's first investment transaction with Len Tosto and T&T involved several "hard money loan" deals. The hard money loan deals worked as follows: (1) the Laker Group found properties and borrowers to purchase the properties. The borrowers/purchasers financed the purchase of the properties and any repair work through One Nation. In exchange for the financing to purchase and repair of a home, the borrower/purchaser granted One Nation a mortgage on the home. In addition, the borrower paid One Nation monthly interest. The expectation was that the borrower/purchaser would sell or refinance the property shortly after the purchase. If the borrower/purchaser was unable to sell or refinance the property within a certain time, the borrower could obtain an extension and pay a fee which ranged from $500.00 to $1,000.00. (Tosto dep., Defendant's Exhibit 6A at 59-60.)

One Nation obtained the funds it loaned to borrowers from "hard money loans" made to One Nation by investors. T&T was one such investor. When the Laker Group found a purchaser for a property, One Nation would advise T&T of the loan necessary to fund the purchase and repair work. T&T received 15% interest on the use of its money until the property sold, plus four points (4% of the loan amount). (Stalter dep., Defendant's Exhibit 6B at 94, 158; Arslanian dep., Defendant's Exhibit 6E at 140-141). When the property sold, T&T was repaid the entire amount of its initial investment.

In June, 2007, Len Tosto and Arslanian met at Arslanian's law office to discuss the hard money loan investments to be made by T&T. (Stalter dep., Defendant's Exhibit 6B at 73-75; Arslanian dep., Defendant's Exhibit 6E at 102-103.) Both Arslanian and Len Tosto, through Len Tosto's interest in T&T, decided to invest in these hard money loan investments brought to them by Laker Group and One Nation. Arslanian and Tosto

3

agreed that Arslanian and T&T would make a like investment in each property and each would be paid points and interest on the individual loans. (Tosto dep., Defendant's Exhibit 6H; Arslanian dep., Defendant's Exhibit 6E at 138-139). Arslanian and Tosto expected that T&T and Plaintiff would make a profit on these investments, based on the 15% interest, the payment of 4 points at the time the hard loan money was advanced, and the representation (made by the Laker Group and One Nation) that the principal would be repaid when the borrower either sold of re-financed the property. (Tosto Affidavit, Defendant's Exhibit 5; Tosto dep., Defendant's Exhibit 6A at 117-118; Arslanian dep. Defendant's Exhibit 6E at 112.)

Starting in July, 2007, One Nation contacted T&T and Len Tosto and advised Len Tosto as to the amount of investment money needed in order to fund each hard money loan. (Stalter dep., Defendant's Exhibit 6B at 56.) Len Tosto would present the investment opportunity to Arslanian with no obligation for Arslanian to participate and with the option of passing on the opportunity. (Arslanian dep., Defendant's Exhibit 6E at 135-136, 148-149, 153-154, 154-165, 167.) If Arslanian decided to participate, Tosto would tell Arslanian the amount needed to fund the loan and instruct him to make the checks payable directly to the title company conducting the closing on the property. Arslanian would write checks to the title company which were picked up by Tosto or One Nation and taken to the closing. Arslanian and T&T each provided fifty (50%) percent of the funding for each hard money loan. (Arslanian dep., Defendant's Exhibit 6E at 136; and Defendant's Exhibit 6 I.)

Between July 9, 2007 and August 23, 2007, Arslanian invested $645,539.28 in various properties brought to T&T by the Laker Group and One Nation. Arslanian

4

received fifteen (15%) percent interest on most of the properties bought with T&T's investment money. The fifteen (15%) percent interest was paid on a monthly basis. Arslanian also received a payment of 4 points (4% percent) on the initial loan amount. As the properties were sold, Arslanian received his principal investment back. (Arslanian dep., Defendant's Exhibit 6E at 150, 152; Plaintiff's Exhibit 6, Part 8, Exhibit 6Q.) T&T invested approximately the same amount in hard money loans as Arslanian. (Tosto Affidavit; Defendant's Exhibit 5.) Between July 9, 2007 and September, 2008, Arslanian received interest, points, and some principal payoffs. By September, 2008, Arslanian had received a total of $391,539.28, including the repayment of principal, interest, and points on some of the properties. (Plaintiff's Exhibit 6, Part 8, Exhibit 6Q.) Len Tosto received approximately the same return on the hard money loans. (Tosto Affidavit, Defendant's Exhibit 5.)

In 2008, the real estate market crashed nation wide. (Stalter dep., Defendant's Exhibit B at 99.) In 2008, One Nation stopped making interest payments on the hard money loans. Many properties which were part of Investment I were never sold and the principal amount invested was not repaid to either Arslanian or T&T. Arslanian and T&T lost money when One Nation stopped making payments on the hard money loans. (Tosto dep., Defendant's Exhibit 5, ¶ 15.)

Arslanian helped fund investments through T&T to another real estate venture, referred to by the parties as "Investment II." In September, 2007, Len Tosto advised Arslanian of a real estate investment opportunity with the Laker Group. The Laker Group had located 18 foreclosed properties being sold by a bank as a bulk purchase. The Laker Group's proposal was that T&T would fund the purchase price for the

5

properties and when the Laker Group sold the properties, the Laker Group would split the profits evenly with the T&T. Len Tosto proposed to Arslanian that Arslanian and T&T split the cost of the bulk purchase and split the profits when the properties were sold. (Tosto dep., Defendant's Exhibit 6A at 196, 197.) The Laker Group never represented to either Arslanian or T&T that interest would be paid by the Laker Group on the funds for the bulk purchase. (Stalter dep., Defendant's Exhibit 6B at 144-145, 171-173.)

On or about September 28, 2007, Arslanian and T&T each invested approximately $133,000.00 in the bulk sale purchase. The Laker Group made the purchase of the properties and subsequently marketed the properties.

As the properties were marketed, potential buyers of the properties would occasionally seek "hard money" loans from T&T for the purpose of either purchasing the property or rehabilitating the property. Those "hard money" loans were not funded by Arslanian. With regard to the properties in Investment II, Arslanian's profits were limited to the profit made on the sale of the properties purchased through the bulk purchase. (Tosto Affidavit, Defendant's Exhibit 5; Plaintiff's Exhibit 6, Part 8, Exhibit 6Q at.2.). Ultimately, most of the properties in the bulk purchase were sold; six properties were not sold. From the properties that sold, Arslanian received $109,731.22 on his original investment and a profit of $7,443.83. Since Arslanian had invested $133,138.54, Arslanian lost $15,963.49 on his original investment. T&T lost a similar amount of money. (Tosto Affidavit, Defendant's Exhibit 5; Plaintiff's Exhibit 6, Part 8, Exhibit 6Q at 2.)

On December 3, 2009, T&T Investment Properties, LLC, filed a voluntary petition

6

09-77048-mbm    Doc 133    Filed 10/06/11    Entered 10/06/11 16:10:30    Page 6 of 12

under Chapter 7 of the Bankruptcy Code. On April 6, 2010, Paul Arslanian filed a claim against T&T in the amount of $853,216.55. On April 6, 2011, Leo Tosto, a fifty (50%) percent shareholder in T&T (Debtor) filed an objection to Arslanian's claim.

On May 10, 2011, the Court held a hearing on Leo Tosto's objection to Arslanian's claim. The Court granted in part and denied in part Leo Tosto's objection to Arslanian's claim. The Court ruled that Arslanian and T&T were joint investors in Investment I and Investment II and as joint investors they shared equally in the profits and losses of those investments. The Court therefore disallowed Arslanian's claim for the loss of his original investment. The Court ruled that the only claim Arslanian could have against T&T would be a claim for interest, points, or profits collected by T&T and not paid over to Arslanian. The Court adjourned the final hearing on Leo Tosto's objection to Arslanian's claim to allow the parties to file proposed finds of fact regarding the balance of Arslanian's claims. On July 15, 2011, Arslanian and Leo Tosto filed their Proposed Findings of Fact.

II.

SUMMARY OF PARTIES PROPOSED FINDINGS OF FACTS

The record clearly supports this Court's prior finding that Arslanian was a co-investor with T&T in Investment I and Investment II. (See "Opinion Denying Plaintiff's Motion for Summary Judgment" in Adversary Proceeding No. 10-4902 (Docket No. 82)). Arslanian's only possible claim against T&T is for points, interest, extension fees or other profits that were collected by T&T and not paid over to Arslanian. Arslanian now asserts that he is owed $16,425.39 from Investment I; $7,553.33 from Investment II; and $29,479.68 from an investment referred to by the parties as Investment III.

7

Leo Tosto's position is that Arslanian may have a small claim related to the non-payment of money received by T&T and not turned over to Paul Arslanian. Tosto argues that Arslanian is not entitled to any money from T&T for investments made through Investment II and further asserts that T&T was not involved in any of the investments through which Arslanian claims he is entitled to money through Investment III.

III.

LAW ON ALLOWANCE OF CLAIMS

The Bankruptcy Code permits a creditor to file a proof of claim either executed by the creditor, or by the creditor's authorized agent. 11 U.S.C. § 501(a); Fed. R. Bankr. P.3001(b). A proof of claim is deemed allowed unless an objection is filed. 11 U.S.C. § 502(a). If an objection is filed, a hearing is held by the bankruptcy court to determine whether the claim should be allowed or disallowed and the amount of the claim. 11 U.S.C. § 502(b); *See Pension Benefit Guar. Corp. v. Belfance*, (*In re CSC Industries, Inc.*), 232 F.3d 505, 509 (6th Cir. 2001) ("bankruptcy courts have the statutory authority to determine the *allowability* and *amount* of" claims).

During the claims allowance process, the burden of proof shifts between the parties. Initially, a creditor bears the burden of establishing its claim. *See* Fed. R. Bankr. P. 3001(f). If a claim is based on a writing, a copy of the writing is to be filed along with the proof of claim. Fed. R. Bankr. P.3001(c). Once a creditor properly executes and files a proof of claim in accordance with the Federal Rules of Bankruptcy Procedure, its proof of claim is considered "*prima facie* evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); *In re Stoecker*, 5 F.3d 1022, 1028 (7th

8

Cir. 1993); *Ashford v. Consolidated Pioneer Mortgage*, (*In re Consolidated Pioneer Mortgage*), 178 BR. 222 (B.A.P. 9th Cir. 1995). Generally, courts have held that when a proof of claim fails to comply with the requirements of Rule 3001(c), the claim will not be considered *prima facie* valid as to the claim or amount. *See In re Henry*, 311 B.R. 813, 817 (Bankr. W.D. Wash. 2004) (citations omitted).

If a party objects to the claim, the objecting party carries the burden of going forward with evidence to overcome the *prima facie* validity and amount of the claim. *See In re Dow Corning Corp.*, 250 BR. 298, 321 (Bankr. E.D. Mich. 2000) (citing *Juniper Dev. Group v. Kahn*, 993 F.2d 915, 925 (1st Cir. 1993) and *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991). If the objecting party produces evidence to refute at least one of the allegations essential to the claim's legal sufficiency, the burden of persuasion shifts back to the claimant. *Id*. (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992). The claimant ultimately bears the burden of proving the validity of the claim by a preponderance of the evidence. *Id*.; accord *In re Hollars*, 198 BR. 270, 271 (Bankr. S.D. Ohio 1996).

IV.

ARSLANIAN'S CLAIMS AGAINST T&T

Arslanian argues that he has a claim against T&T for $16,425.39 from Investment I; $7,553.33 from Investment II; and $29,479.68 from Investment III. The Court will deal with each of the these amounts separately.

With regard to Investment I, the Court finds Arslanian's arguments and exhibits unintelligible. Arslanian bases his claim on an exhibit labeled Exhibit 3. In that Exhibit, there is a column entitled "Owed to Arslanian (½ of Additional Received by T&T and

9

Extension fees)." Under that column heading, several amounts are listed which total $16,425.39. Each of those amounts is followed by a reference to an Exhibit. In reviewing the exhibits, referenced by Exhibit 3, the Court is unable to relate the documents referenced in Exhibit 3 with the dollar amounts claimed by Arslanian. Therefore, Arslanian failed to meet his burden of proof with regard to the amounts allegedly owed to him by T&T related to Investment I. However, the Court will give Arslanian seven (7) days from the entry of this Order to explain how the information set forth in "Exhibits A - Exhibit I" establish that Arslanian is entitled to a claim of $16,425.39. Arslanian seeks payment on nine (9) separate transactions; Arslanian must provide a full and complete explanation as to where each of the amounts comes from and specify whether the amount sought is interest, an extension fee, points, or some other amount allegedly retained by T&T and not paid over to Arslanian.[2]

With regard to Investment II, the Court finds that Arslanian has failed to meet his burden of proof that he has a claim against T&T for any amounts related to Investment II. As fully detailed in the depositions and affidavits in the record, and this Court's "Opinion Denying Plaintiff's Motion for Summary Judgment" in Adversary Proceeding No. 10-4902 (Docket No. 82), Arslanian's role in Investment II was solely to provide fifty (50%) percent of the funds for a bulk sale purchase of foreclosed properties. T&T provided the other fifty (50%) percent of the funds. Arslanian and T&T were to profit by splitting the profit at the time the houses were sold. There was never an agreement

---

[2]Tosto concedes that Arslanian might be owed $2,500.00 by T&T from the return of an overpayment of funds advanced (See p. 6 of Tosto's Proposed Findings of Fact) by T&T to purchase a property located at 281 Arlington, Detroit, MI. The Court requests that the parties file any documents which pertain to the sale of the Arlington property within seven (7) days of the entry of this Opinion.

10

between T&T, Arslanian and the Laker Group, the entity which made the bulk sale purchase, as to the payment of interest. Twelve of the eighteen properties purchased in the bulk sale purchase sold and Arslanian was paid fifty (50%) percent of the profits from the sale of the properties. Arslanian has not provided any evidence in the form of deposition testimony or records that substantiate his argument that he is entitled to additional funds from Investment II. Therefore, Arslanian's claim with regard to Investment II is disallowed.

Arslanian also alleges that he is entitled to a claim against T&T for losses sustained through investments Arslanian made with Len Tosto in Investment III. As fully detailed in this Court's "Opinion Denying Plaintiff's Motion for Summary Judgment" in Adversary Proceeding No. 10-4902 (Docket No. 82), T&T was not involved in Investment III. Investment III was an investment deal involving Len Tosto, Paul Arslanian and entity owned solely by Len Tosto, LRT Investment Properties. There is no documentation or evidence in the record to substantiate Arslanian's claim that T&T ever received any money or had any involvement in the real properties which were part of Investment III. Therefore, Arslanian's proof of claim to the extent it relates to Investment III is disallowed.

V.

CONCLUSION

For the reasons set forth above, to the extent that Arslanian's claim against T&T relates to "Investment II" and "Investment III", the claim is disallowed. To the extent that Arslanian's claim relates to monies allegedly paid to T&T for real properties in "Investment I", in the form of extension fees, interest, or other amount returned to T&T,

11

Arslanian has seven (7) days from the entry of this Order to provide a more complete explanation as to the basis for his claim.

Signed on October 06, 2011

                                                         /s/ Marci B. McIvor
                                                         Marci B. McIvor
                                                         United States Bankruptcy Judge